Dobbins v. Cragin.

JOHN B. DOBBINS

v.

CHARLES I. CRAGIN et al.

1. Complainant was engaged in the manufacture of soap and boot-polish. By four several agreements he sold the use of his name and all interest in the plant to C. & Co. for a term of twenty years. There was no question as to the limitation expressed in these agreements. A fifth agreement was entered into by complainant and C. & Co., which was declared to be supplementary to the fourth agreement annexed thereto. It was in three paragraphs.—*Held,* that the word "not" in the first paragraph of the fifth agreement was insufficient to pass a perpetual unlimited right to carry on the business of manufacturing the soap and boot-blacking, no words of perpetuity being used in connection therewith, and the word in question being limited by the agreement to which its immediate context is declared to be a supplement.

2. By the second paragraph of the fifth agreement complainant did not release his right to manufacture the soap &c. after the expiration of twenty years, as he did not derive such right from the former agreements.

3. The word "hereafter" in the receipt is insufficient to pass a perpetual right to manufacture the soap &c., there being no words denoting perpetuity used therewith.

4. Where complainant, after the twenty years, files a bill to enjoin the further use of his name, and the contract is asserted by defendants to have conveyed a perpetual right to his name, and the bill alleges that the actual contract between the parties limited the period to twenty years, and that if the writings are capable of being so construed as to give an unlimited right to defendants, then such construction would be a fraud on complainant, and ought not to be adopted, such allegation sufficiently charges fraud.

Dobbins *v.* Cragin.

5. Under the circumstances, complainant's delay of fifteen months in noti-fying defendants of his claim cannot be treated as an admission on his part that he originally understood that he had sold his interest absolutely to defendants.—*Held further*, that upon the evidence as to the effect of the fifth agreement it would be inequitable to construe the agreement so as to pass a perpetual right to complainant's name and business.

Bill for injunction and account.    Heard on bill, answer, replication and proofs produced orally.

*Mr. Archer* and *Mr. Elcock* (of Philadelphia), *Mr. Thomas B. Harned* and *Mr. Samuel H. Grey,* for the complainant.

*Mr. Brewster,* *Mr. Johnson* and *Mr. Terry* (of Philadelphia) and *Mr. Lewis Starr,* for the defendants

PITNEY, V. C.

The contest between the parties relates to the right to manufacture a certain soap and to use certain trade-marks in its sale: in which the complainant's name occurs.

The parties all reside in Philadelphia, and the contracts out. of which the controversy arise were made and the litigation was first commenced there. The reason for transferring it to this state was that the defendant Cragin, together with other parties: acting in his interest, was about to organize, or had organized, a corporation under the laws of the State of New Jersey, named "The Dobbins' Electric Soap Manufacturing Company," and proposed to vest in it a plant for the manufacture of soap which he owns and operates in this state, so that the corporation should continue its manufacture here.

The articles of incorporation were filed July 3d, 1890. The original bill was filed in this court August 7th, 1890, and upon it, with the affidavits annexed, an order was made that the defendants show cause at a future day why an injunction should not issue, with interim restraint. That order came on to be heard on October 4th, 1890, and at the hearing the complainant expressing a desire to amend his bill, leave was granted and an amended bill filed, and matters stood without change under the

Dobbins v. Cragin.

original bill and order until the cause was brought to hearing upon the amended bill, answer and proofs.

It is admitted by the defendants that the complainant was at one time the owner of the secret of manufacturing the soap in question, and had the sole right to make it and to use the trade-marks in question, and that the defendants derived the right to make the soap &c., and to use the trade-marks in its sale, from the complainant by certain written instruments, and the question is as to the extent in time of such right.

The complainant contends that it was limited to a period of twenty years from March 17th, 1869. The defendants, on the other hand, claim that the grant was unlimited in time. The bill, as originally framed, relied upon the language of the written instruments alone; the amendment consists of an allegation that the actual contract between the parties so limited it, and that if the writings are capable of being so construed as to give an unlimited right to the defendants, then such construction would be a fraud upon the complainant and ought not to be adopted.

The established facts are—that the complainant was the original inventor of the particular combination which produces the soap in question; that previous to 1869 he had engaged largely in its manufacture and had spent large sums of money in advertising it, and had thereby become seriously involved financially. He had also adopted certain trade-marks which he used on the labels of the manufactured articles, and had caused them to be copyrighted under the federal statute. The defendant was agent for the sale of his goods, but was not possessed of the secret of making the soap, which was retained by the complainant in his own individual keeping.

[Here follows a statement of the several agreements and contracts mentioned in the bill.]

This statement of the substance of the several agreements entered into up to this date, October 1st, 1869, shows that Cragin's rights under them were clearly limited to the term of twenty years from March 17th, 1869, and no contention to the contrary was made by the counsel for the defendant.

Dobbins v. Cragin.

Reliance is placed for the unlimited extension of the term upon a fifth contract in writing, being the third between complainant and Cragin & Co., dated January 21st, 1870. That contract is declared, in the premises, to be " *supplementary to the articles of agreement made and executed October 1st, A. D. one thousand eight hundred and sixty-nine, between the said parties, and hereto annexed,*" and provides :

I. That J. B. D. doth covenant and agree " that he will not make or assist in making or cause to be made directly or indirectly for himself or any other person or persons, Dobbins' Electric Soap, Dobbins' Medicated Toilet Soap, Dobbins' Electric Boot Polish, *or any soap or soaps, boot blacking or boot blackings or any article or articles in imitation or as a substitute for* said Dobbins' Electric Soap, Dobbins' Medicated Toilet Soap, or Dobbins' Electric Boot Polish *or any soap or soaps or boot blacking or boot blackings*, and that he will not instruct or give any information he may possess to any person or persons without the written consent of said I. L. Cragin & Co. respecting the manufacture or use of any of said articles." (The italics are mine.)

It will be seen that this article is a repetition of the seventh clause of the agreement of October 1st, 1869, without the limitation of twenty years, and includes all soaps and boot-blacking of every kind, while the clause in the previous agreement was confined to the three articles previously therein mentioned, namely, Dobbins' Electric Soap, Dobbins' Medicated Toilet Soap and Dobbins' Electric Boot Polish.

II. That said J. B. D. "releases and forever quitclaims unto J. L. Cragin & Co. all his right, title, and interest, claim and demand, in, to and under the said agreement of October 1, 1869, and the agreements therein recited, except the covenant contained in paragraph fourth of the annexed agreement of October 1, 1869, to be kept and performed by I. L. Cragin & Co. [which provides for the leasing of the factory from Dobbins] which covenant on the part of I. L. Cragin & Co. and all of the covenants and agreements on the part of J. B. D. in said annexed agreement and those therein recited and all *the transfers and assignments thereby made* are to be and remain in full force and virtue."

III. Provides for the giving of certain notes of Cragin & Co., and payment of certain money in full consideration, viz. :

(1) Cragin & Co. to assume the outstanding acceptances specified in the agreement of May 1st, 1869.

(2) To pay $1,000 in cash and give their notes amounting to $16,000.

(3) To surrender two notes of Dobbins for $680 each, held by Cragin & Co.

(4) To pay Ringwalt & Co. a debt of $2,422.80 which Dobbins owed them.

This agreement is executed by all the parties, and then follows a receipt dated, as is the original, January 21st, 1870, signed by complainant alone, wherein he acknowledges the receipt of the said promissory notes and cash provided for in the third paragraph of the agreement, and this receipt is in turn followed, above the signature, by this clause :

"As a part of the foregoing written agreement, the said John B. Dobbins also hereby covenants and agrees with the said I. L. Cragin & Company that they may use his name upon and as descriptive of any soap or blacking they may hereafter make, whether such as now manufactured by them or not."

On the part of the defendant it is contended that the first and second clauses of the body of the agreement, taken in connection with the license contained in the receipt just quoted, amount to a release to Cragin & Co. of all Dobbins's right and interest forever in the trade-secret and trade-marks in question, and to a perpetual license to them to use his name on any soap or blacking they might thereafter make.

On the other hand, it is contended by the complainant's counsel that this agreement must be read as a supplement to, and in connection with, that of October 1st, 1869, and that the twenty years limitation so often repeated in the original agreement must be construed as applying to each and every part of the supplement; that the word "*not*" used in the first clause—"will *not* make or assist in making"—does not convey the idea of unlimited time, but read, as it must be, as part of the agreement of October 1st, 1869, clearly refers to the period of twenty years therein mentioned. And as to the second clause, they contend that the matter there released was not the complainant's right in

remainder to use exclusively his process of making soap and his name and trade-marks, but simply and only his right to royalty under the previous agreements, as if a lessor should release to his lessee not the land demised but the rents reserved by the lease.    And with regard to the clause in the receipt, they contend that the word "*hereafter*" in its surroundings there means simply in the "time to come" during the unexpired term of twenty years, and they comment upon the absence of any of the language ordinarily used by lawyers to convey a remainder with perpetual restriction.

In considering this contract, it is observable at once, on its face, that it was framed and drawn by a lawyer, and with deliberation.    It shows no indication of immature consideration or hasty preparation.    If then, as defendant contends, the minds of the parties had met, and the common intention was that complainant should grant to defendant the perpetual unlimited right so plainly granted for twenty years only by the contract of March 17th, 1869, we would naturally expect to find a lawyer employing the usual and appropriate language for that purpose, which we find in the first agreement.    One mode which I think would have suggested itself would have been to recite or refer to the previous grant for twenty years, and then enlarge it by such express, direct and appropriate language as would leave nothing to inference or construction.

With this preliminary observation, and bearing in mind that the question just now is not what did the parties intend to say, but what did they mean by what they did say, let us examine the writing in detail.

The first section at first glance appears to be a mere enlarged paraphrase of the seventh section of the agreement of October 1st, 1869, with the limitation of time omitted, and the question at once arises, and is asked by defendants' counsel, Why repeat the covenant in the latter agreement except for the purpose of dropping the limitation of time?    This question at once suggests the other, If the object was to make the covenant perpetual, why not use proper language?    Why not, instead of saying merely "*will not,*" say "will never at any time hereafter for-

ever?" But the object of the insertion of this first clause is easily accounted for by a comparison of it with its prototype, section 7 of the agreement of October 1st. Such comparison shows that the later covenant is enlarged so as to include not only the three articles—electric soap, medicated toilet soap, electric boot polish—covered by the previous covenants, but also "any soap or soaps or boot blacking or boot blackings or any article or articles in imitation or as a substitute for" the three before-mentioned articles, "or any soap or soaps or boot blacking or boot blackings." The importance of having such enlarged covenant is manifest when we consider that under all the preceding contracts complainant's sole and only source of income for his invention and labor was in the royalties he was to receive from the sale of the manufactured article, and hence his interest was of itself a protection to the defendants; but the effect of the new agreement about to be executed would be to destroy all that interest and make him measurably indifferent as to the success of the defendants' venture. Hence the appropriate and very comprehensive covenant.

The force, then, of this first section in indicating that the complainant intended to grant, and the defendant supposed he was receiving, a grant in perpetuity, depends solely upon the force of the word "not" in the context above recited. It seems to me to be wholly insufficient for that purpose. It is never used in ordinary conversation, much less in a contract prepared with deliberation, to mark unlimited time. We always look to the context for the extent of the negative it declares. Here it is naturally limited by the text of the agreement to which its immediate context is declared to be a supplement and annex.

Coming now to the second section, it seems to me to need but little consideration to lead to the conclusion that it cannot bear the construction claimed by the defendants, and that the complainant's position as to it is sound. By it Dobbins releases simply and only his right in, to and under the previous agreements, except the fourth paragraph of the agreement of October 1st, providing for the lease of the factory. Now those rights were simply and only a right to royalties and compensation for

his services.  These were compounded and paid for by a sum in gross under this third paragraph.  Dobbins did not derive his right to manufacture this soap and use his own name as a part of a trade-mark in its sale &c. from any of those agreements. Such right was not created or secured by, and did not depend upon, either of them.  His rights were inherent in him before those contracts were made.  The writings did, indeed, acknowledge in the most solemn manner that he was the owner of those rights.  In fact, the agreements were all based on such ownership, but they did not create it.

At the argument the very able and ingenious counsel for the defendants likened the agreement of March 17th, 1869, and that of January 21st, 1870, to the common-law conveyance of lease and release.  But the difference is manifest.  In a lease and release of land the release is not of the rents reserved by the lease, but of the very land itself; not of the rights which the lessor had under and by virtue of the lease, but of his rights in the land which he owned before the lease was made, and upon which it was founded, and which ownership the lessee by accepting the lease recognizes and admits.

So plain to my mind is this, that I cannot conceive that the counsel who drew this agreement, presumably with the previous ones before him, could ever have adopted the verbiage of this second clause as a means of granting to the defendants the rights in question.

It is further suggested, that as no royalties were reserved to complainant by the contract of March 17th, 1869, there was no interest under it which he could release, and nothing upon which the verbiage of this second section could operate, unless it be applied to the right to resume the use of his name &c. at the end of the term; and hence it is argued that, in order to give effect to the language, it should be presumed that the right to be released was the right to resume the use of the secret and name. But the paper of March 17th, 1869, contains a covenant on the part of Cragin to pay a sum of money, being the balance of the purchase-money therein mentioned, and upon this covenant the release could operate.  Moreover, the two writings of March,

1869, show on their face such an intimate connection as to justify their being treated as one. Besides, I do not know of any rule of construction which would justify a court in holding that an expression like this now in question, which expressly releases rights arising under a certain instrument or instruments, should be construed as releasing rights which did not and could not arise under that instrument, although there were no rights arising under it which could be released. The maxim *ut res majis valeat quam pereat* does not reach far enough to cover such a case.

The third paragraph merely provides for the compensation for the royalties released by the second.

This is the whole of the agreement as originally prepared and as finally executed by all the parties, and the conclusion is that it wholly fails to grant to defendants the rights now in question.

But there remains to consider the receipt which follows the main agreement. This, after stating a specific receipt for the payments provided for in the agreement proper, contains the clause above quoted, viz. :

"As a part of the foregoing written agreement, the said John B. Dobbins also hereby covenants and agrees with the said I. L. Cragin & Company that they may use his name upon and as descriptive of any soap or blacking they may hereafter make, whether such as now manufactured by them or not."

The defendants rely upon the word "*hereafter*" in it as indicating a grant in perpetuity to defendants to use his (complainant's) name upon any and all soaps and blackings the defendants may thereafter manufacture.

Now I think the word "hereafter" used as an adverb does not necessarily refer to unlimited time. Like the word "not," it is not used in common parlance for such a purpose. It is not a synonym for "forever." It rather indicates the direction in time merely to which the context refers, and is limited by it. The duration of the "hereafter" is usually expressed by some other word, or is inferred from the context. In fact, the mind does not rest satisfied with the use of the word "hereafter" in such case, but naturally inquires, and expects to hear in addi-

Dobbins v. Cragin.

tion, how long the *hereafter* is to last. This is illustrated by its use in deliberate written agreements. I do not recollect to have ever seen one prepared by an expert in which the word "hereafter" was relied upon alone to express perpetuity; but where such is the task in hand it is always accompanied by "forever," or other word definitely expressing perpetuity.

To illustrate: Suppose the clause now under consideration had been introduced, as well it might have been, into the first agreement of March 17th, 1869, would any person for a moment contend that it gave the defendants the right to use the complainant's name for a longer period than twenty years? I think there can be but one answer to the question. No such force could have been given to the word "hereafter," but it would have been naturally and necessarily limited to the term of twenty years mentioned in the grant itself. But if the word used as an adverb has, from its own inherent force, the effect, like the word "forever," of conveying the idea of perpetuity, then I do not see why it should not be so considered even if found in connection with a grant expressly limited in time.

Now how does the case as it actually stands differ from that just supposed? The contracts of March 17th and 30th were carried forward and consolidated with modifications into the contract of October 1st. The latter contract changed the amount and mode of payment of the royalty, but left the limitation of time upon the grant unchanged and expressly recognized. This last contract was, in substance, made a part of the contract of January 21st, 1870, now under consideration. We have seen that the main supplementary contract made no change in its original, but merely changed the mode of payment of the royalties thereby reserved. Now, when we come to construe this little supplement to a supplement, we naturally and, as it seems to me under the circumstances, necessarily look to the October contract as well as to that of January for the context to answer the inquiry, How long does this indefinite "hereafter" extend?

The fundamental rules of construction not only permit, but require, us to take into consideration every part of the writing in order to ascertain the meaning of each. *2 Whart. Cont.* §

*662; Barton* v. *Fitzgerald, 15 East 54; 2 Pars. Cont. (ed. 1866) 501; Browning* v. *Wright, 2 Bos. & P. 13.*

The place in the contract which this clause occupies and its scope should be noticed in this connection. After the contract had been prepared, and, as far as appears on its face, after it had been executed, but before the consideration had been paid, it would seem to have occurred to the defendant that it might be important to him and his associates to have the right to use complainant's name on soap and blacking not made according to complainant's recipe, and express permission so to do was asked and granted. This is the only explanation which can account for its being inserted in the mere receipt, since if it had been intended to use it as a means of acquiring a perpetual license in pursuance of a previous verbal agreement to that effect, it is difficult to conceive how it could have been omitted from the body of the agreement.

Further, I think the latter part of the second section is not without significance in this connection. It expressly provides that

"all the covenants and agreements on the part of said John B. Dobbins in said agreement hereto annexed and the therein recited agreements and all the *transfers and assignments* thereby made are to be and remain in full force and virtue."

Now if the present agreement was to have the effect of assigning and transferring to Cragin & Co. all the right and interest for all time of Dobbins in the trade-secret and trade-marks and the use of his name, why expressly declare that a transfer and assignment for the limited period should be and remain in full force and virtue?

The inaptness of the frame of the agreement, and the language used to accomplish the result claimed, is well illustrated by a reference to that part of the answer which sets out the defendant's claim in this behalf, viz. :

" And this defendant expressly charges that by said agreement of January 21, 1870, the said complainant bargained, sold, assigned and set over unto the said I. L. Cragin & Co., absolutely, all his right, title, interest, claim and demand, whatsoever that he had or claimed to have in the invention, discovery and

Dobbins v. Cragin.

recipe of Dobbins' Electric Soap, Dobbins' Electric Boot Polish and Dobbins' Medicated Toilet Soap, and all the said complainant's claims, rights and ownership in the trade-marks, designs, stencils, cards, labels and descriptions and all other rights appertaining to the manufacture of said articles."

And again by a comparison with the explicit and complete language above quoted of the assignment of March 17th, 1869.

This inaptness was pointed out on both the occasions of the discussion of the construction of this contract before the court, and counsel for the defendants were more than once asked the question, "Why, if the draftsman of this agreement meant to convey the reversion, did he not say so in plain language?" and no answer at all satisfactory to my mind was made.

There is still another element in the case which seems to me not without weight. By the terms of the October agreement the defendant came under heavy obligations to advance money for the complainant and as his surety, for which he had no other security than the complainant's interest in the prospective royalties. This liability amounted to at least $40,000. The effect of the main agreement of January 21st, 1870, was to wipe out this liability and to extinguish all Dobbins's right to royalties for the remainder of the term of twenty years. The writings do not disclose how much these royalties had amounted to from March 30th to October 1st, 1869, but we are justified in inferring that they were considerable, otherwise the defendant would not have been willing to assume the heavy obligations just referred to in the October contract on the strength of them. These royalties were compounded for a sum of less than $20,000. This is all provided for in the body of the agreement, and, as I have interpreted it, without in any wise affecting the complainant's right to assume control of his property at the end of the term. The position in the writing of the clause now under consideration indicates that whatever may have been its object it was an after-thought, not taken into consideration in concluding the agreement contained in the principal writing. Now I find it difficult to believe that complainant at this stage of the negotiation, and without any further consideration, would have cooly signed away his reversionary interest, and quite as difficult to

believe that the defendant if at that stage he had induced complainant to transfer it to him would have been content to have it witnessed by the language in question.

I conclude, then, that the written contract does not result in a grant or license from complainant to defendants in perpetuity. It must be construed as limited to the term of twenty years mentioned in the first and subsequent agreements.

It was conceded by defendants that if such is the true construction of the contract, then complainant is entitled to the relief prayed for, and I might well stop here.

But the complainant goes further, and alleges that the real and actual contract assented to by him, and which he agreed should be put in writing, was in accordance with this view; that he never agreed to extend the period of twenty years, and did not understand the written contract to do so; and that if it is capable of such construction it is a fraud upon him and should not be enforced by this court.

This allegation in the bill is met by positive allegation in the answer that the real and actual bargain between the parties was as defendants allege, and that the contract was designed and framed to carry out that bargain.

Upon this issue much evidence has been taken, and I feel it to be my duty to state the effect of it on my mind, so that, upon a review of my results by a higher court and possible disagreement with my views of the effect of the writings, the parties may have the benefit of my view of the evidence on this point.

A preliminary point was made by the defendants' counsel that the bill does not contain sufficient allegation in this behalf to warrant the court in reforming the contract, and seasonable objection on that ground was made to the proofs adduced. The allegations of the bill in that behalf are, first, that on January 21st, 1870, complainant, by agreement of that date, released to the defendant all his rights under the previous agreements, viz., a royalty of five per cent. &c.; that defendant first caused to be prepared, and asked the complainant to execute, an agreement which did expressly assign the reversion, which paper complainant declined to execute on that ground, and then alleges that if

the contract afterwards executed can be interpreted to mean that he conveyed his reversionary interest, then it was a fraud upon him, inasmuch as he was assured at the time of its execution that it merely released his royalties during the term.

It further alleges that he was asked to assent to and sign the contractual clause in the receipt on the suggestion of the defendant that he might during the term of twenty years desire to use complainant's trade-mark on some other soap or blacking, and that he desired the insertion of the clause in question for that purpose, and that he signed the document with that understanding, and that if it can be construed as giving the defendant the right to use his name forever, it is a fraud upon him because contrary to his agreement.

Now, if the complainant was seeking affirmative relief based upon the agreement evidenced by this writing, and was asking to have it actually reformed because, in some particular, it did not accord with the actual contract, the objection of lack of proper allegation might—I do not say it would—have some weight. But such is not the case. The present situation is clearly distinguishable from such. The complainant here is asking relief based solely upon his original title, and he shows that the defendant is in possession under an agreement for a term of years, which he alleges has expired, and, strictly in accordance with the rules of equity pleading, he anticipates a defence to be set up under the writing in question, and meets it by alleging that if the contract is capable of the construction claimed for it by the defendant, it is inequitable that he should be permitted to set it up, because such was not the understanding and agreement of the parties. The prayer is, in substance, not to reform the contract, but that the defendant may not be permitted to contend that it has the signification in question.

And just here it is important to observe that the complainant in this behalf sets up what amounts to a unilateral mistake merely, viz., that the complainant did not so understand the contract and did not so agree, and therefore the contract should not be so enforced against him. His prayer, in effect, is to rescind to that extent, and not to reform. The distinction between such

a case and that of the actual reformation of the writing, and its enforcement in accordance with the agreement of both parties, is important.

Again, it is objected that there is no direct allegation of fraud practiced by the defendants. The allegation, in substance, is that the intention and agreement of the parties was that complainant should release his right to the royalties only, and that defendants might use his name and trade-marks on other articles than those specified in the agreement, and that if the writings are capable of a different construction, then it is a fraud for the defendants to set up such construction.

This is, in substance, charging a mistake, and that it will be a fraud in the defendants to attempt to take advantage of it. I think the allegation is sufficient.

Certain facts are either admitted or so thoroughly established by the evidence as not to be disputed.

[Here follows a statement of the facts.]

This review of the evidence leads my mind to this conclusion, that the defendant Cragin intended to acquire, and supposed he was acquiring the complainant's reversionary rights, but that the complainant, Dobbins, did not so understand, but did understand that the negotiations and sale were confined to the royalties reserved by the previous contract, and that in arriving at that understanding he was not guilty of any negligence; that the defendant intended to instruct his counsel to provide for the transfer of complainant's whole interest, but failed to make himself understood by his counsel, so that the latter framed and prepared the contract proper in such shape that it did not affect the reversion, and that in that shape it was submitted to complainant's counsel, who found it to agree with what he understood from both parties to be the actual contract; that the contractual part of the receipt was an after-thought by the defendant, framed by him and inserted at his request for the purpose only of enabling him to use the complainant's name on other soaps during the time he already had the right to use it on complainant's own invention, and was not intended or understood by either party to enlarge or extend the defendants' right in point of time beyond what the body of the agreement had already done.

Dobbins v. Cragin.

It may be that the defendant supposed that the body of the agreement had the effect of transferring to him the complainant's right for all time, but the defendant and his counsel did not so understand it, and the defendant never so consciously agreed. The parties' minds had never met on that subject. And I do not find it difficult on a review of the evidence, especially of the memorandum of instructions, to understand how the parties failed to understand each other. There were four objects or classes of objects which might be the subject of negotiation—*first*, the special payments undertaken by Cragin & Co. in the first, second and third clauses of the agreement of October 1st; *secondly*, the royalties reserved in the fifth clause thereof; *thirdly*, the rent of the factory dealt with in the fourth clause; and, *fourthly*, the use of the secret and trade-marks and name after the expiration of the term of twenty years. Now it seems to me that it was not difficult for the complainant and his counsel to understand any terms of universality which the defendant may have used during the negotiations to be intended to apply to and include only the money payments and royalties, and thus their minds did not meet on the point now in controversy.

It seems to follow from this view that if the contractual clause of the agreement be capable of the more extended construction which the defendant claims that it bears, it would be inequitable for him, having himself framed it avowedly for a different purpose, to set it up and insist upon its enforcement as against the complainant in this enlarged sense.

The answer is not framed for cross-relief by way of reformation to accord with defendant's understanding. His counsel expressed themselves as content with the writings as they now read; and, of course, as I view the evidence, the case does not warrant such relief, even if prayed for.

This result renders it unnecessary to consider the point discussed at the argument as to whether the license to use complainant's name, if perpetual, warrants its insertion in the name of a corporation.

I will advise a decree for the complainant. Its scope and terms will be settled upon motion.